## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KRISTIN HAFOKA, ERIN FULLER RANDALL, DIANNA DAY, ERIC WIIG, MICHAEL CROW, PAWEL KRZYKOWSKI, KRISTEN DAVIS-JONES, THOMAS KUKITZ, TAYLOR GIRARD, SAMUEL MATHEW, JOSHUA HUNTER RHOADES, RICHARD JESKY, and JENNIFER KEANE, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>CONDUENT INCORPORATED,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Kristin Hafoka, Erin Fuller Randall, Dianna Day, Eric Wiig, Michael Crow, Pawel Krzykowski, Kristen Davis-Jones, Thomas Kukitz, Taylor Girard, Samuel Mathew, Joshua Hunter Rhoades, Richard Jesky, and Jennifer Keane (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Class Action Complaint against Defendant Conduent Incorporated ("Defendant"), alleging as follows, based upon personal knowledge, information and belief, and investigation of counsel.

## I.    INTRODUCTION

1.      This class action arises from Defendant's failure to properly secure and safeguard Plaintiffs' and approximately 4,300,000 Class Members' sensitive personal health information ("PHI") and personally identifiable information ("PII"), which as a result, is now the hands of cybercriminals.

2.      In or around March 2024, an unknown actor used Defendant's login credentials to hack into an unstructured SharePoint data repository Defendant managed with its business partner, HealthEquity, Inc. and its subsidiaries WageWorks, Inc. and Further Operations, LLC (together, "HealthEquity"), and exfiltrated Plaintiffs' and Class Members' sensitive PII and PHI stored therein, including their first and last names, addresses, telephone numbers, employers, Social Security numbers, dependent information, payment card information, health card numbers, health plan member numbers, service types, medical diagnoses, and prescription details (collectively, "Private Information"), causing widespread injuries and damages to Plaintiffs and Class Members (the "Data Breach").

3.      The Data Breach, which Defendant failed to detect until June 2024, is the direct result of Defendant's failure to implement even basic data security measures or oversight to reasonably protect Plaintiffs' and Class Members' Private Information in its custody and control. Indeed, if Defendant had implemented reasonable cybersecurity measures—including sufficient safeguards for initial access or adequate logging, monitoring, and alerting tools—then the hackers would not have been able to hack into Defendant's cloud-based server, perform reconnaissance functions necessary to identify the location of Plaintiffs' Private Information, and then exfiltrate that data all without being detected for months.

4.      Defendant "delivers digital business solutions and services spanning the commercial, government and transportation spectrum," and "leverages cloud computing, artificial intelligence, machine learning, automation and advanced analytics" in servicing its clients and business partners.[1]

---

[1] *See UPDATE: Conduent's BenefitWallet HSA Portfolio Moving to HealthEquity*, HealthEquity (Sept. 2023), https://ir.healthequity.com/news-releases/news-release-details/update-conduents-benefitwallet-hsa-portfolio-moving-healthequity.

5.      Defendant's business partners include HealthEquity and its subsidiaries, which are one of the nation's largest providers of health saving accounts ("HSA") and other consumer-directed benefits, like flexible spending accounts, health reimbursement arrangements, and COBRA benefits (collectively, "CDBs"), typically paired with employer-sponsored group health insurance plans.

6.      Plaintiffs and Class Members are current and former participant-customers of HealthEquity, who received HSAs, CDBs, and/or other services from HealthEquity, and related third-party administration services from Defendant. As a condition of obtaining these products and services, Plaintiffs and Class Members were required to entrust their sensitive, non-public Private Information to HealthEquity and through HealthEquity, to Defendant.

7.      To facilitate its business and the services provided to Plaintiffs and Class Members, Defendant collected, used, shared, and maintained Plaintiffs' and Class Members' Private Information on a SharePoint account shared with HealthEquity. Defendant could not perform its regular business activities without collecting and maintaining Plaintiffs' and Class Members' Private Information and retains this information for at least many years, even after the customer relationship had ended.

8.      Businesses that handle consumers' Private Information like Defendant owe the individuals to whom the information relates a duty to adopt reasonable measures to protect it from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—and especially hackers with nefarious intentions—will harm the affected individuals, including but not limited to the invasion of their private health and financial matters.

9. Defendant breached its duties owed to Plaintiffs and Class Members by failing to safeguard the Private Information it collected and maintained, including by failing to implement industry standards for data security to protect against cyberattacks, failing to use safeguards for initial access to Private Information-storing data repositories, and failing to implement reasonable or adequate logging and alerting methods, which allowed criminal hackers to access and steal millions of individuals' Private Information from Defendant's care.

10. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus, Defendant knew that failing to take reasonable steps to secure the Private Information left it in a dangerous condition. Indeed, Defendant as a sophisticated technology company knew the importance of proper data protection and was on notice that its systems were vulnerable.

11. Defendant failed to adequately protect Plaintiffs' and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive data when it was maintained on Defendant's SharePoint. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect Plaintiffs' and Class Members' sensitive data.

12. Defendant breached its duties and obligations by failing, in one or more of the following ways: (a) to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (b) to design, implement, and maintain reasonable data retention policies; (c) to adequately train or oversee service providers regarding data security; (d) to comply with industry-standard data security practices; (e) to warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (f) to encrypt or adequately encrypt the Private

Information that was stored on Defendant's SharePoint; (g) to recognize or detect that its SharePoint had been compromised and accessed in a timely manner to mitigate the harm; (h) to utilize widely available software able to detect and prevent this type of attack; (i) to require and ensure it trained all employees with access to Defendant's SharePoint regarding reasonable and proper data security practices; and (j) to otherwise secure the Private Information using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

13.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality and security of their Private Information. In providing their Private Information to Defendant, Plaintiffs and the Class Members reasonably expected this sophisticated business entity to keep their Private Information confidential and security maintained, to use this information for business purposes, and to disclose it only as authorized. Defendant failed to do so, resulting in the unauthorized disclosure of Plaintiffs' and Class Members' Private Information in the Data Breach.

14.    Hackers targeted and obtained Plaintiffs' and Class Members' Private Information because of the data's value in exploiting and stealing Plaintiffs' and Class Members' identities. As a direct and proximate result of Defendant's inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiffs' and Class Members' Private Information was accessed by cybercriminals and exposed to an untold number of unauthorized individuals. The present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes.

15.    The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud, and the exposure of an individual's Private Information due to breach ensures that the individual will be at a substantially increased and

certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of his or her life. Mitigating that risk, to the extent even possible, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

16.     The risk of identity theft caused by this Data Breach is impending and has materialized, as there is evidence that the Plaintiffs' and Class Members' Private Information was targeted, accessed, misused, and disseminated on the dark web.

17.     To make matters worse, although the Data Breach occurred on March 25, 2024, Defendant waited an additional *four months* after that before notifying Plaintiffs and Class Members, through HealthEquity, that their Private Information had been compromised, diminishing Plaintiffs' and Class Members' ability to timely and thoroughly mitigate and address harms resulting from the Data Breach.

18.     As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries in fact including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress in with dealing with the Data Breach; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect the consumer data it collects and maintains.

19.     To recover for these harms, Plaintiffs, on behalf of themselves and the Class as defined herein, bring claims for negligence/negligence per se, invasion of privacy, and unjust enrichment, to address Defendant's inadequate safeguarding of Plaintiffs' and Class Members' Private Information in its custody and Defendant's failure to provide timely or adequate notice to Plaintiffs and Class Members that their information was compromised in the Data Breach.

20.     Plaintiffs and Class Members seek compensatory, nominal, statutory, and punitive damages, declaratory judgment, and injunctive relief requiring Defendant to (a) disclose, expeditiously, the full nature of the Data Breach and the types of Private Information exposed; (b) implement improved data security practices to reasonably guard against future breaches of Private Information in Defendant's possession; and (c) provide, at Defendant's own expense, all impacted Data Breach victims with lifetime identity theft protection services.

## II.     PARTIES

### *Plaintiffs*

21.     Plaintiff Kristin Hafoka is a natural resident and citizen of Utah.

22.     Plaintiff Erin Fuller Randall is a natural resident and citizen of Utah.

23.     Plaintiff Dianna Day is a natural resident and citizen of California.

24.     Plaintiff Eric Wiig is a natural resident and citizen of California.

25.     Plaintiff Michael Crow is a natural resident and citizen of Colorado.

26.     Plaintiff Pawel Krzykowski is a natural resident and citizen of Connecticut.

27.     Plaintiff Kristen Davis-Jones is a natural resident and citizen of Florida.

28.     Plaintiff Thomas Kukitz is a natural resident and citizen of Florida.

29.     Plaintiff Taylor Girard is a natural resident and citizen of Louisiana.

30.     Plaintiff Samuel Mathew is a natural resident and citizen of New York.

31.    Plaintiff Joshua Hunter Rhoades is a natural resident and citizen of Pennsylvania.

32.    Plaintiff Richard Jesky is a natural resident and citizen of Washington.

33.    Plaintiff Jennifer Keane is a natural resident and citizen of Washington.

34.    At all relevant times, and as alleged below, Plaintiffs received third-party administration services from Defendant in connection with the products and services Plaintiffs obtained from Defendant's business partner, HealthEquity. As a condition of and in exchange for their receipt of Defendant's services, each Plaintiff was required to provide his or her Private Information to Defendant.

### *Defendant*

35.    Defendant Conduent Incorporated is a corporation organized under the state laws of New York with its headquarters and principal place of business 100 Campus Drive, Florham Park, New Jersey 07932.

### III.    JURISDICTION AND VENUE

36.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different than Defendant.

37.    This Court has personal jurisdiction over Defendant because its principal place of business is in this state, Defendant regularly conducts business in this state, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this state.

38.    Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant resides in this District.

## IV.    GENERAL FACTUAL ALLEGATIONS

**A. Defendant Collected and Maintained Plaintiffs' and Class Members' Private Information to Operate and Facilitate its Business.**

39.    Defendant "delivers digital business solutions and services spanning the commercial, government and transportation spectrum," and "leverages cloud computing, artificial intelligence, machine learning, automation and advanced analytics" in servicing its clients and business partners.[2]

40.    One of Defendant's business partners is HealthEquity (including HealthEquity subsidiaries WageWorks and Further Operations), one of the nation's largest providers of HSAs and other CDBs, like flexible spending accounts ("FSA"), health reimbursement arrangements ("HRA"), and COBRA benefits, typically paired with employer-sponsored group health insurance plans.

41.    In or around September 2023, Defendant entered into a data management partnership with HealthEquity in connection with Defendant's transfer of its HSA assets and customers to HealthEquity. Upon the transfer, Conduent became HealthEquity's preferred partner for HSA and CDB administration, which relationship continues to date.[3]

42.    HealthEquity is a custodian of HSAs and provides CDBs and related services to customers, typically members of employee-sponsored group health plans.

43.    Plaintiffs and Class Members are current and former customers of HealthEquity who received third-party administration services from Defendant in connection with Plaintiffs' and Class Members' HSAs or CDBs.

---

[2] *See UPDATE: Conduent's BenefitWallet HSA Portfolio Moving to HealthEquity*, HealthEquity (Sept. 2023), https://ir.healthequity.com/news-releases/news-release-details/update-conduents-benefitwallet-hsa-portfolio-moving-healthequity.

[3] *See Conduent Sells HSA Assets for $425M in Leaving FSA Business*, PlanSponsor, https://www.plansponsor.com/168431-2__trashed-2/.

44.    As a condition of receiving the HAS or CDB services, Plaintiffs and Class Members were required to provide HealthEquity and, in turn, Defendant with their sensitive and non-public Private Information, which Defendant maintained on a SharePoint server it shared with and managed for its business partner, HealthEquity.

45.    Defendant used Plaintiffs' and Class Members' Private Information to operate its business and derive economic benefits, including monetary benefits and payment for managing the Private Information on HealthEquity's behalf, and could not provide its third-party benefit administration services without this data.

46.    Additionally, upon information and belief, Defendant benefits from collecting Private Information from Plaintiffs and Class Members by using the data for its analytics and marketing purposes.

47.    In exchange for receiving Plaintiffs' and Class Members' Private Information, Defendant promised to safeguard the sensitive and confidential data, to use it only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

48.    Based on Defendant's express and implied representations and warranties and to obtain third-party administration services from Defendant, Plaintiffs and Class Members' Private Information was provided to Defendant, directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and protected against unauthorized access. Consumers, in general, demand security for their Private Information, especially when Social Security numbers and sensitive health and financial data are involved.

49.     The data Defendant held and controlled in its SharePoint at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class Members.

**B. Defendant Owed Duties to Adopt Reasonable Data Security Measures for Private Information it Collected and Maintained.**

50.     As part of its business, Defendant collects millions of individuals' Private Information, including that of Plaintiffs and Class Members, and stores and shares this data with on Defendant's SharePoint server.

51.     Defendant had and continues to have duties to adopt reasonable measures to keep Plaintiffs' and Class Members' Private Information confidential and protected from disclosure to unauthorized third parties, and to audit, monitor, and verify the integrity and cybersecurity of its cloud-based data repositories.

52.     Defendant had and has obligations stemming from the Federal Trade Commission ("FTC") Act, the Health Insurance Portability and Accountability Act ("HIPAA"), common law, contract, and industry standards, to keep Plaintiffs' and Class Members' Private Information confidential and protected from unauthorized disclosure.

53.     Additionally, by obtaining, using, and benefitting from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting that Private Information from unauthorized access and disclosure.

54.     Defendant also owed a duty to protect Plaintiffs and Class Members from the harm that insufficient data security and consequential exposure of their Private Information would cause, because such harm was foreseeable and reasonably preventable.

55.     Defendant knew it was storing valuable, sensitive Private Information in its cloud-based communal SharePoint and that as a result, the SharePoint would be an attractive target for cybercriminals.

56.     Defendant also knew that any breach of its SharePoint and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the millions of individuals whose Private Information was compromised, as well as intrusion into their private and sensitive personal, financial, and medical matters.

57.     Defendant's duty to protect Plaintiffs and Class Members from the foreseeable risk of injury that inadequate data protection and unauthorized exposure of their Private Information would case obligated Defendant to implement reasonable practices to keep Plaintiffs' and Class Members' sensitive Private Information confidential and securely maintained, to use and disclose it for necessary and authorized purposes only, to delete the data from network systems or applications when no longer necessary for legitimate business purposes, and to train its employees on reasonable cybersecurity red flags and protection techniques.

58.     Defendant owed the foregoing duties to protect Private Information in its custody from unauthorized disclosure, and Defendant had the practical ability to fulfill those duties—yet, it failed to do so, causing the Data Breach.

## C. Defendant's Failure to Adequately Safeguard Plaintiffs' and Class Member's Private Information Caused the Data Breach.

59.     In or around late July 2024, HealthEquity began sending Plaintiffs and other Data Breach victims correspondence titled "Notice of Data Breach" ("Notice Letters").

60.     The Notice Letters generally inform as follows:

We are writing to you because we have determined that a data security event may have resulted in limited unauthorized access to or disclosure of certain personally identifying information in our care as managed by one of our vendors. . . . The data

security incident resulted in unauthorized access to or disclosure of some individuals' information including yours.

**What happened?**

After receiving an alert, on March 25, 2024, HealthEquity became aware of a systems anomaly requiring extensive technical investigation and ultimately resulting in data forensics until June 10, 2024. Through this work, we discovered some unauthorized access to and potential disclosure of protected health information and/or personally identifiable information stored in an unstructured data repository outside our core systems. On June 26, 2024, after validating the data, we unfortunately determined that some of your personal information was involved.

**What information may have been Involved?**

The affected data primarily consisted of sign-up information for accounts and benefits we administer. The data may include information in one or more of the following categories: first name, last name, address, telephone number, employee ID, employer, social security number, health card number, health plan member number, dependent information (for general contact information only), service type, diagnoses, prescription details, and payment card information (but not payment card number or HealthEquity debit card information).

61. The Notice Letters further inform Data Breach victims as follows:

Health Equity, Inc. (HealthEquity) is the custodian of HSAs and a directed third-party administrator of FSA/HRA and COBRA plans associated with [employer name], which you may work for or have worked for in the past. . . . HealthEquity, Inc. is the parent corporation of WageWorks, Inc. and Further Operations LLC. Data for the parent and subsidiaries was affected by this data security event.

62. Omitted from the Notice Letters were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

63. Additionally, the Notice Letters omitted the identity of the so-called vendor through which the hackers behind the Data Breach were able to gain access to the SharePoint server storing Plaintiffs' and Class Members' Private Information. Plaintiffs were only able to confirm Defendant

is the vendor referred to in the Notice Letters through their counsel's own investigation following the Data Breach.

64.    Thus, Defendant's purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

65.    To make matters worse, Plaintiffs and Class Members received no notice of the Data Breach until four months after it happened, when HealthEquity finally began notifying Plaintiffs and Class Members that the sensitive Private Information entrusted to Defendant is now in criminal hackers' possession. Defendant itself has never to date notified Plaintiffs and Class Members about the Data Breach or Defendant's involvement. This unreasonable and unexplained delay deprived Plaintiffs and Class Members of crucial time to address and mitigate the heightened risk of identity theft and other harms resulting from the Data Breach.

66.    Though Defendant has not explained the delay, it is likely that the delay was caused by Defendant's failure to implement reasonable cybersecurity measures. For example, HealthEquity admitted that it and Defendant failed to complete its initial investigation into the extent of the unauthorized SharePoint intrusion and the Private Information involved until June 2024, which strongly implies that Defendant lacked the reasonable logging, monitoring, and alerting tools that are an expected part of any reasonable cybersecurity precisely because they empower companies to timely detect, stop, and/or otherwise respond to malicious activity and intrusions

67.     Since receiving the Notice Letter, Plaintiffs have learned the Data Breach occurred when an unauthorized and unknown actor gained entry to Defendant's SharePoint data storage location through Defendant's employee's user account with access to the server.

68.     Plaintiffs' and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Defendant's deficient security for consumers' data caused and allowed criminals to target and take files containing Plaintiffs' and Class Members' inadequately protected, unencrypted Private Information from Defendant's SharePoint server through an employee's user account.

69.     As the Data Breach and its timeline evidences, Defendant did not use reasonable security measures appropriate to the nature of the sensitive Private Information collected from Plaintiffs and Class Members and maintained and shared on its SharePoint server, such as encrypting the information; deleting the data from the server when it was no longer needed; revoking employee user accounts' access to servers storing Private Information when such access was no longer needed; restricting access to the SharePoint server to only employees that are necessary and adequately trained to prevent unauthorized use of their login credentials; requiring sufficient verification such as multi-factor authentication for user accounts to access servers storing Private Information; training employees about cybersecurity and attempts to gain unauthorized access; investigating and addressing vulnerabilities in its data security practices; and/or implementing the necessary safeguards to enable Defendant to identify malicious activity. These failures allowed and caused cybercriminals to target Defendant's SharePoint server and carry out the Data Breach.

70.     Defendant could and should have prevented this Data Breach by ensuring its files and servers containing Plaintiffs' and Class Members' Private Information were properly secured, sanitized, and encrypted, but failed to do so.

71.     Additionally, Defendant could have prevented this Data Breach by examining its cybersecurity protocols and ensuring vulnerabilities were identified and addressed and reasonable safeguards were continuously maintained, but failed to do so.

72.     Additionally, Defendant failed to require protection against common hacking techniques like phishing, a tactic that uses social engineering to send emails containing malicious attachments to targeted organizations or individuals,[4] and relies on user execution (like opening an email or downloading an attachment) to gain access.[5]  Defendant could and should have prevented this Data Breach by requiring all users with access to the SharePoint server storing Plaintiffs' and Class Members' Private Information to implement phishing-resistant (i.e., non-SMS text based) multi-factor authentication and train employee account users to recognize and report phishing attempts, but failed to do so.

73.     Defendant could and should have implemented the following measures to prevent and detect the Data Breach, as recommended by the Microsoft Threat Protection Intelligence Team, but failed to do so:

**Secure internet-facing assets**

-     Apply latest security updates
-     Use threat and vulnerability management
-     Perform regular audit; remove privileged credentials;

---

[4] *See    Phishing*,    MITRE    ATT&CK    (March    1,    2024), https://attack.mitre.org/versions/v15/techniques/T1566.
[5] *See    User    Execution*,    MITRE    ATT&CK    (April    12,    2024), https://attack.mitre.org/versions/v15/techniques/T1204.

16

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events.[6]

74.     Defendant's tortious conduct as detailed in this Complaint is evidenced by Defendant's failure to recognize the Data Breach until months after cybercriminals had breached its SharePoint and accessed Plaintiffs' and Class Members' Private Information stored therein—meaning Defendant had no effective means in place to ensure that cyberattacks were detected and prevented.

75.     Defendant's negligence in safeguarding Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data.

**D. Defendant Knew of the Risk of a Cyberattack because Businesses in Possession of Private Information are Particularly Suspectable.**

76.     Defendant's negligence, including its gross negligence, in failing to safeguard Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

---

[6] *See* Microsoft Threat Intelligence, *Human-operated ransomware attacks: A preventable disaster* (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster.

77.    Private Information of the kind accessed in the Data Breach is of great value to cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the internet black market known as the dark web.

78.    Private Information can also be used to distinguish, identify, or trace an individual's identity, such as his or her name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information connected or linked to an individual such as his or her birthdate, birthplace, and mother's maiden name.

79.    Data thieves regularly target entities that store Private Information like Defendant due to the highly sensitive information they maintain. Defendant knew and understood that Plaintiffs' and Class Members' Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize it through unauthorized access.

80.    Cyberattacks against institutions such as Defendant are targeted and frequent. According to Contrast Security's 2023 report, "Cyber Bank Heists: Threats to the financial sector," "[o]ver the past year, attacks have included banking trojans, ransomware, account takeover, theft of client data and cybercrime cartels deploying 'trojanized' finance apps to deliver malware in spear-phishing campaigns."[7]

81.    According to the Identity Theft Resource Center's report covering the year 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506)

---

[7] Tom Kellermann, *Cyber Bank Heists: Threats to the financial sector*, at 5, CONTRAST SECURITY https://www.contrastsecurity.com/hubfs/Cyber%20Bank%20Heists%20Report%2020 23.pdf (last accessed Oct. 10, 2024).

set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[8]

82.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant itself. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[9]

83.     Defendant's data security obligations were particularly important given the substantial increase, preceding the date of the subject Data Breach, in cyberattacks and/or data breaches targeting entities like Defendant that collect and store PHI.

84.     In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

85.     Additionally, as companies became more dependent on computer systems to run their business,[10] e.g., working remotely as a result of the Covid-19 pandemic, and the Internet of

---

[8] *See* Identity Theft Res. Ctr., *2021 Annual Data Breach Report Sets New Record for Number of Compromises*, ITRC (Jan. 24, 2022), https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises.

[9] IBM, *Cost of a data breach 2022: A million-dollar race to detect and respond*, https://www.ibm.com/reports/data-breach (last accessed Oct. 10, 2024).

[10] Bd. Governors of the Fed. Res. Sys., *FEDS Notes* (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[11]

86.    Entities with custody of PHI, like Defendant, reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach.[12] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage. Almost 50% of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.[13]

87.    Thus, the healthcare industry and business operating within it have become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[14]

88.    PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It

---

[11] Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022* (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

[12] *See* Identity Theft Res. Ctr., *2022 Annual Data Breach Report*, https://www.idtheftcenter.org/publication/2022-data-breach-report.

[13] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims..

[14] *9 Reasons why Healthcare is the Biggest Target for Cyberattacks*, SWIVELSECURE, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Oct. 10, 2024).

can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

89.     As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[15]  A complete identity theft kit with health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[16]

90.     Defendant knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for it.

91.     As a business in possession of consumers' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members and of the foreseeable consequences if its network systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to a breach. Nevertheless, Defendant failed to implement or follow reasonable cybersecurity measures to protect against the Data Breach.

92.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

---

[15] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDExperts (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.
[16] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world* (Sept. 30, 2014), https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

93.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its SharePoint server, amounting to millions of individuals' detailed Private Information, and, thus, the millions of individuals who would be harmed by the exposure of that unencrypted data.

94.     Given the nature of the Data Breach, it was foreseeable that Plaintiffs' and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiffs' and Class Members' names.

95.     Plaintiffs and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and Class Members especially vulnerable to identity theft, medical and financial fraud, and the like.

**E.  Defendant Was Required But Failed to Comply with FTC Rules and Guidance.**

96.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

97.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which establishes cyber-security guidelines for businesses like Defendant. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

98.    The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

99.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

100.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendant must undertake to meet their data security obligations.

101.    Such FTC enforcement actions include actions against entities in the healthcare industry like Defendant. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

102.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private

Information. The FTC publications and orders described above also form part of the basis of Defendant's duties in this regard.

103.    The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."

104.    Defendant failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

105.    Defendant's failures to employ reasonable and appropriate means to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

**F.  Defendant Was Required But Failed to Comply with HIPAA.**

106.    Defendant is a covered businesses under HIPAA (45 C.F.R. § 160.102) and required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and C.

107.    Defendant is further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. See 42 U.S.C. § 17921; 45 C.F.R. § 160.103.

108.    HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting PHI that is kept or transferred in electronic form.

109.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information."  45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

110.    HIPAA's Security Rule required and requires that Defendant do the following:

a.  Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b.  Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.  Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.  Ensure compliance by their workforce.

111.    HIPAA also required and requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information."  45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights."  45 C.F.R. §164.312(a)(1).

112.    HIPAA and HITECH also require procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. See 45 C.F.R. § 164.306(a)(1), (a)(3).

113.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. See 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."

114.    HIPAA's Breach Notification Rule further requires that within 60 days of discovering a breach of unsecured patient PHI, as is this Data Breach, Defendant must notify each individual affected regarding the nature of the breach, the PHI compromised, steps the individual should take to protect against potential resulting harm, and what Defendant is doing to protect against future breaches. 45 C.F.R. § 164.404(b).

115.    Additionally, to the extent Defendant creates, receives, maintains, or transmits PHI in connection with group health plan arrangements, Defendant is a business associate as defined under HIPAA. 45 C.F.R. § 160.103.

116.    HIPAA requires that when a covered entity provides PHI to a business associate, like Defendant, the business associate use appropriate safeguards to protect electronic PHI from unauthorized disclosure. 45 C.F.R. § 164.504(e)(2)(ii).

117.    As alleged herein, Defendant violated HIPAA and HITECH. Defendant (a) failed to maintain adequate security practices, systems, and protocols to prevent data loss, (b) failed to mitigate the risks of a data breach, (c) failed to ensure the confidentiality and protection of PHI, (d) failed to require or ensure appropriate safeguards to prevent the unauthorized disclosure of Plaintiffs' and Class Members' Private Information, and (e) failed to provide the required Data Breach notice within 60 days of discovering the incident.

**G. Defendant Failed to Comply with Industry Standards.**

118.    A number of published industry and national best practices are widely used as a go-to resource when developing an institution's cybersecurity standards.

119.    The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

120.    The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

a.    Control who logs on to your network and uses your computers and other devices.

b.    Use security software to protect data.

c.    Encrypt sensitive data, at rest and in transit.

d.  Conduct regular backups of data.

e.  Update security software regularly, automating those updates if possible.

f.  Have formal policies for safely disposing of electronic files and old devices.

g.  Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

121.    Further still, CISA makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.

122.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet

Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

**H. Defendant Owed Plaintiffs and Class Members a Common Law Duty to Safeguard their Private Information.**

123.    In addition to its obligations under federal and state laws, Defendant owed a common law duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant's duty owed to Plaintiffs and Class Members obligated it to provide reasonable data security, including consistency with industry standards and requirements, and to ensure that their servers, networks, and protocols adequately protected Plaintiffs' and Class Members' Private Information.

124.    Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its custody and control, including adequately training its employees with access to Private Information within Defendant's servers.

125.    Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

126.    Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

127.    Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

128.    Defendant owed these duties of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

129.    Defendant tortiously failed to take precautions required to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure. Defendant's actions and omissions represent a flagrant disregard of Plaintiffs' and Class Members' rights.

**J.    Plaintiffs and Class Members Suffered Common Injuries and Damages due to Defendant's Conduct.**

130.    Defendant's failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately caused injuries to Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

131.    The ramifications of Defendant's failures to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

132.    Plaintiffs and Class Members are also at a continued risk because their Private Information remains on Defendant's server, which has already been shown to be susceptible to compromise and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security measures to protect consumers' Private Information in its care.

133.    As a result of Defendant's ineffective and inadequate data security practices, the consequential Data Breach, and the foreseeable outcome of Plaintiffs' and Class Members' Private Information ending up in criminals' possession, all Plaintiffs and Class Members have suffered and will continue to suffer the following actual injuries and damages, without limitation (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized

risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

### *Present and Ongoing Risk of Identity Theft to Plaintiffs and Class Members*

134.    Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

135.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[18]

136.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

---

[17] 17 C.F.R. § 248.201 (2013).

[18] *Id.*

137.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[19] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[20] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

138.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, PHI and PII like the Private Information at issue here.[21] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[22] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[23]

139.    The unencrypted Private Information of Plaintiffs and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted

---

[19]    Louis DeNicola, *What Is the dark web?*, EXPERIAN (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.
[20] *Id.*
[21] *What is the dark web?* – Microsoft 365 (July 15, 2022), https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.
[22] *Id.*; DeNicola, *supra* note 20.
[23] *Supra* note 22.

marketing without the approval of Plaintiffs and Class Members. Unauthorized actors can easily access and misuse Plaintiffs' and Class Members' Private Information due to the Data Breach.

140.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

141.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

142.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[24]

---

[24] Social Security Admin., Pub. No. 06-10064, *Identity Theft and Your Social Security Number* (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

143.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[25] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[26]

144.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[27] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[28]

145.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

146.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[29]

---

[25] *See* Social Security Admin., *Avoid Identity Theft: Protect Social Security Numbers*, https://www.ssa.gov/phila/ProtectingSSNs.htm (last visited Oct. 10, 2024).
[26] *Id.*
[27] *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft (last visited Oct. 10, 2024).
[28] *See* Julia Kagan, *What is an SSN? What to Know About Social Security Numbers* (Sept. 2, 2024), https://www.investopedia.com/terms/s/ssn.asp.
[29] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Aug. 23, 2024).

147.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for credit lines.[30]

148.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols*., No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."); *see also McFarlane v. Altice USA, Inc*., 524 F. Supp. 3d 264, 272 (S.D.N.Y. Mar. 8, 2021) (noting that Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves"; Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when stolen can "forever be wielded to identify [the victim] and target his in fraudulent schemes and identity theft attacks.").

149.    Similarly, California's Attorney General warns consumers: "Originally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of

---

[30] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), available at https://www.ssa.gov/pubs/EN-05-10064.pdf.

your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[31]

150.    Theft of PHI, in particular, is gravely serious as well: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[32]

151.    PHI is likely to be used in detrimental ways, including by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[33]

152.    Another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[34]

153.    "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[35]

154.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft.

---

[31] *See* Office of the Attorney General of Cal., *Your Social Security Number: Controlling the Key to Identity Theft*, https://oag.ca.gov/idtheft/facts/your-ssn (last visited Oct. 10, 2024).
[32] *See* Fed. Trade Comm'n, *What to Know About Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Oct. 11, 2024).
[33] *Id.*
[34] DistilInfo, *70% Of Data Involved In Healthcare Breaches Increases Risk of Fraud* (Oct. 3, 2019), https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud
[35] *Id.*

Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[36]

155.    The reality is that cybercriminals seek nefarious outcomes from a data breach" and "stolen health data can be used to carry out a variety of crimes."[37]

156.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[38]

157.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

158.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still

---

[36] Experian, The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches, available at https://www.experian.com/assets/databreach/white-papers/consequences-medical-id-theft-healthcare.pdf (last accessed Mar. 14, 2023). .
[37]    Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019) https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[38] "Fullz" is fraudster speak for data that includes the victim's information, including but not limited to name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Recs. for Sale in Underground Stolen from Texas Life Ins. Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

159.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

160.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

161.    The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

162.    Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice,

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[39]

---

[39] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

163.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[40]

164.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[41] Yet, Defendant failed to rapidly report to Plaintiffs and Class Members that their Private Information was stolen.

165.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

166.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

167.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

168.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this

---

[40] *See* Fed. Bureau of Investigations *2019 Internet Crime Report Released* (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.
[41] *Id.*

Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

169.    In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[42]

170.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

171.    Plaintiffs and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

172.    These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports,

---

[42] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. GOV'T ACCOUNTABILITY OFFICE, June 2007, https://www.gao.gov/ new.items/d07737.pdf (last visited Feb. 26, 2024) ("GAO Report").

contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[43]

173.    Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

### *Diminished Value of Private Information*

174.    Private Information is a valuable property right.[44] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

175.    For example, drug and medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

176.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[45]

---

[43] *See* Fed. Trade Comm'n, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Oct. 11, 2024).
[44] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PRIVATE INFORMATION") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("PRIVATE INFORMATION, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[45] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

177.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells on the dark web for $50 and up.

178.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[46]  In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[47] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[48]

179.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

180.    However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### *Reasonable and Necessary Future Cost of Credit and Identify Theft Monitoring*

181.    To date, Defendant has done nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach.

---

[46] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, LA TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[47] https://datacoup.com/.
[48]    Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, available athttps://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Oct. 11, 2024).

182.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money, filing false tax returns, taking out loans or lines of credit, or filing false unemployment claims.

183.    Such fraud may go undetected until debt collection calls commence months or even years later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

184.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[49] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers and medical histories). Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future, if not forever.

185.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members

---

[49] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The dark web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### *Loss of Benefit of the Bargain*

186.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

187.    When agreeing to provide their Private Information, which was a condition precedent to obtain third-party administration services from Defendant, and paying Defendant, directly or indirectly, for these products and services, Plaintiffs and Class Members as consumers understood and expected that they were, in part, paying a premium for services and data security to protect the Private Information they were required to provide.

188.    In fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than they reasonably expected to receive under the bargains struck with Defendant.

## V.    PLAINTIFFS' EXPERIENCES AND INJURIES

### Plaintiff Kristin Hafoka

189.    As a condition of receiving third-party administration services from Defendant, Plaintiff Hafoka was required to supply Defendant with her Private Information, including but not limited to her full name, contact information, employee ID, employer, address, Social Security number, health card number, health plan member number, dependent information, service type, diagnosis, and prescription details.

190.    Plaintiff Hafoka greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Hafoka diligently protects her Private Information and

stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

191.    At the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Hafoka's Private Information on its SharePoint server with inadequate data security, causing Plaintiff Hafoka's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

192.    As a result of the Data Breach, Plaintiff Hafoka has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy and underlying facts of the Data Breach. Plaintiff Hafoka has spent significant time on mitigation activities in response to the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

193.    Plaintiff Hafoka further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Hafoka is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

194.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Hafoka's and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

195.    Plaintiff Hafoka further believes her Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type

196.    Plaintiff Hafoka has additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

197.    The Data Breach has caused Plaintiff Hafoka to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

**Plaintiff Erin Fuller Randall**

198.    As a condition of receiving third-party administration services from Defendant, Plaintiff Fuller Randall was required to supply Defendant with her Private Information, including but not limited to her full name, date of birth, Social Security number, and more.

199.    Plaintiff Fuller Randall greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Fuller Randall diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

200.    At the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Fuller Randall's Private Information on its SharePoint server with inadequate data security, causing Plaintiff Fuller Randall's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

201.    As a result of the Data Breach, Plaintiff Fuller Randall has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy and underlying facts of the Data Breach. Plaintiff Fuller Randall has spent significant time on mitigation activities in response to the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

202.    Plaintiff Fuller Randall further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Fuller Randall is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

203.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Fuller Randall's and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

204.    Plaintiff Fuller Randall further believes her Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type

205.    Plaintiff Fuller Randall has additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

206.    The Data Breach has caused Plaintiff Fuller Randall to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

### Plaintiff Dianna Day

207.    As a condition of receiving third-party administration services from Defendant, Plaintiff Day was required to supply Defendant with her Private Information, including but not limited to her full name, date of birth, Social Security number, medical diagnoses, prescription details, and more.

208.    Plaintiff Day greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Day diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

209.    At the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Day's Private Information on its SharePoint server with inadequate data security, causing Plaintiff Day's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

210.    Plaintiff Day's Private Information compromised in the Data Breach has already been misused to commit identity theft and fraud against her, evidenced by a suspicious email she received in June 2024 requesting her to DocuSign an agreement with PNC Bank that she did not recognize. Plaintiff Day was forced to spend hours of her time communicating with PNC regarding the DocuSign request.

211.    Additionally, following the Data Breach, Plaintiff Day received notifications that her mother's Private Information had been found on the dark web, which Plaintiff Day believes is because she used the email address compromised in this Data Breach to pay her mother's medical bills.

212.    As a result of the Data Breach, Plaintiff Day has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to over eight hours researching and verifying the legitimacy of the Data Breach, contacting PNC Bank regarding the fraudulent DocuSign request, changing her account passwords, and reviewing her financial account statements—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

213.    Additionally, due to her Private Information's compromise in the Data Breach and the resulting instances of identity theft and fraud committed against her, Plaintiff Day has incurred and will continue to incur approximately $25 per month in out-of-pocket costs to renew her credit monitoring service. Given this Data Breach, Plaintiff Day is wary of signing up for additional services that require her to provide Private Information, and for this reason does not want to sign up for complimentary credit monitoring with an additional service as offered by HealthEquity.

214.    Plaintiff Day further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Day is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

215.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Day and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

216.    Plaintiff Day further believes her Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type

217.    Plaintiff Day has additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, these spam communications were caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

218.    Additionally, the Data Breach has caused Plaintiff Day to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence. The exposure of her Private Information—specifically, her sensitive medical information—has been a source of great stress for Plaintiff Day, and every day she worries about her sensitive information being disseminated to unknown actors. Plaintiff Day works full time and is the primary caretaker for her sick mother, along with suffering from medical issues herself, and the Data Breach has been an additional source of stress and anxiety on top of the stress she already deals with in her daily life. Plaintiff Day is especially concerned that her sensitive medical diagnosis and treatment information was exposed in the Data Breach, which information is the most private and personal to her, which credit monitoring services cannot protect, and which cannot be changed or reversed.

**Plaintiff Eric Wiig**

219.    As a condition of receiving third-party administration services from Defendant, Plaintiff Wiig was required to supply Defendant with his Private Information, including but not limited to his name, address, telephone number, employee ID, employer, social security number, health card number, health plan member number, dependent information, service type, diagnoses, prescription details, payment card information, and other sensitive information.

220.    Plaintiff Wiig greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Wiig diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

221.    At the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Wiig's Private Information on its SharePoint with inadequate data security, causing his Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

222.    As a result of the Data Breach, Plaintiff Wiig has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to verifying the legitimacy of the Notice of Data Breach, monitoring his various financial and banking accounts for fraudulent activity, and monitoring his credit with Experian and Equifax. Plaintiff Wiig has spent significant time on mitigation activities in response to the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

223.    Plaintiff Wiig further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data

Breach, Plaintiff Wiig is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

224.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Wiig's and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

225.    Plaintiff Wiig further believes his Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type

226.    Plaintiff Wiig has additionally suffered actual injury in the form of experiencing a significant increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

227.    The Data Breach has caused Plaintiff Wiig to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

### Plaintiff Michael Crow

228.    As a condition of receiving third-party administration services from Defendant, Plaintiff Crow was required to supply Defendant with his Private Information, including, among other things, his full name, date of birth and Social Security number, and more.

229.    Plaintiff Crow greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Crow diligently protects his Private Information and stores

any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

230.    At the time of the Data Breach—March 2024—Defendant retained Plaintiff Crow's Private Information on its SharePoint server with inadequate data security, causing Plaintiff Crow's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

231.    Plaintiff Crow's Private Information compromised in the Data Breach has already been misused to commit identity theft and fraud against him. Specifically, following the Data Breach Plaintiff Crow experienced identity theft in the form of multiple attempted and successful fraudulent charges to his HSA: an attempted unauthorized transfer of $3,100, a successful unauthorized transfer of $1,100, and a third attempted unauthorized transfer of $280 dollars, which finally resulted in his HSA card being temporarily locked.

232.    As a result of the Data Breach, Plaintiff Crow has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach and dealing with the fraudulent activity on his HSA. Plaintiff Crow has spent significant time resolving the fraudulent activity, including approximately 4–5 hours communicating with HealthEquity to resolve his HSA card lock and obtain a new card —valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

233.    Plaintiff Crow further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Crow is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

234.   The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Crow's and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

235.   Plaintiff Crow further believes his Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type

236.   Plaintiff Crow has additionally suffered actual injury in the form of experiencing a severe increase in spam calls, texts, and/or emails following the Data Breach. On or about August 7, 2024 alone, Plaintiff Crow changed the email address associated with his HSA to his work email address, and immediately received approximately 400 spam emails to that work email address over a two-hour period. Upon information and belief, this misuse of Plaintiff Crow's Private Information was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

237.   The Data Breach has caused Plaintiff Crow to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

**Plaintiff Pawel Krzykowski**

238.   As a condition of receiving third-party administration services from Defendant, Plaintiff Krzykowski was required to supply Defendant with his Private Information, including but not limited to his full name, date of birth, Social Security number, and more.

54

239.    Plaintiff Krzykowski greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Krzykowski diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

240.    Upon information and belief, at the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Krzykowski's Private Information on its SharePoint server with inadequate data security, causing Plaintiff Krzykowski Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

241.    As a result of the Data Breach, Plaintiff Krzykowski has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to verifying the legitimacy of the Notice of Data Breach and monitoring his various financial and banking accounts for fraudulent activity, which has taken approximately 20 hours of his time or more. Plaintiff Krzykowski has spent significant time on mitigation activities in response to the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

242.    Plaintiff Krzykowski further anticipates spending considerable time (1-2 hours per week) and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Krzykowski is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

243.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Krzykowski's and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

244.    Plaintiff Krzykowski further believes his Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type

245.    Plaintiff Krzykowski has additionally suffered actual injury in the form of experiencing a significant increase in spam calls, texts, and/or emails following the Data Breach, including spam communications related to medical conditions and treatments, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

246.    The Data Breach has caused Plaintiff Krzykowski to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

**Plaintiff Kristen Davis-Jones**

247.    As a condition of receiving third-party administration services from Defendant, Plaintiff Davis-Jones was required to supply Defendant with her Private Information, including but not limited to her full name, date of birth, Social Security number, and more.

248.    Plaintiff Davis-Jones greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Davis-Jones diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

249.    At the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Davis-Jones's Private Information on its SharePoint server with inadequate data security, causing Plaintiff Davis-Jones's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

250.    As a result of the Data Breach, Plaintiff Davis-Jones has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy and underlying facts of the Data Breach. Plaintiff Davis-Jones has spent significant time on mitigation activities in response to the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

251.    Plaintiff Davis-Jones further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Davis-Jones is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

252.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Davis-Jones's and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

253.    Plaintiff Davis-Jones further believes her Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type

254.    Plaintiff Davis-Jones has additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information

compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

255.    The Data Breach has caused Plaintiff Davis-Jones to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

**Plaintiff Thomas Kukitz**

256.    As a condition of receiving third-party administration services from Defendant, Plaintiff Kukitz was required to supply Defendant with his Private Information, including but not limited to his full name, date of birth, Social Security number, and more.

257.    Plaintiff Kukitz greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Kukitz diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

258.    At the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Kukitz's Private Information on uts SharePoint server with inadequate data security, causing Plaintiff Kukitz's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

259.    Because of the Data Breach, Plaintiff Kukitz's HSA was temporarily locked, depriving him of his access to those funds during that time.

260.    As a result of the Data Breach, Plaintiff Kukitz has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to verifying the legitimacy of the

Data Breach and monitoring his various accounts for fraudulent activity. Plaintiff Kukitz has spent significant time on mitigation activities in response to the Data Breach, including approximately 8 hours researching the incident, reviewing his HSA, investigating why his HSA was locked, and reaching out to counsel about the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

261.    Plaintiff Kukitz further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Kukitz is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

262.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Kukitz's and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

263.    Plaintiff Kukitz further believes his Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type

264.    Plaintiff Kukitz has additionally suffered actual injury in the form of experiencing a significant increase in spam calls, texts, and emails following the Data Breach, especially to the email address associated with Plaintiff Kukitz's HSA. Upon information and belief, this uptick in spam communications was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

265.   The Data Breach has caused Plaintiff Kukitz to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

### Plaintiff Taylor Girard

266.   As a condition of receiving third-party administration services from Defendant, Plaintiff Girard was required to supply Defendant with her Private Information, including but not limited to her full name, date of birth, Social Security number, and more.

267.   Plaintiff Girard greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Girard diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

268.   At the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Girard's Private Information on its SharePoint server with inadequate data security, causing Plaintiff Girard's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

269.   Plaintiff Girard's Private Information compromised in the Data Breach has already been misused to commit identity theft and fraud against her. Specifically, following the Data Breach Plaintiff Girard experienced identity theft in the form of 14 fraudulent charges to her HealthEquity HSA card, totaling over $1,000, in June 2024. While these unauthorized charges were ultimately reimbursed to Plaintiff Girard, that was only after she spent hours of her time dealing with the fraud and contacting HealthEquity about it. Additionally, because the fraudulent charges to her HSA card drained Plaintiff Girard's HSA of funds, during the time she was resolving

the fraudulent charges and working to get them reimbursed, she was forced to incur out-of-pocket medical expenses that she would have otherwise paid with her HSA.

270.    As a result of the Data Breach, Plaintiff Girard has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy of the Data Breach, dealing with the fraudulent activity on her HSA, contacting HealthEquity to resolve the fraudulent activity, monitoring her accounts, and changing passwords. Plaintiff Girard has spent significant time resolving the fraudulent activity, including approximately 3 hours communicating with HealthEquity to resolve the unauthorized charges to her HSA—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

271.    Plaintiff Girard further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Girard is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

272.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Girard and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

273.    Plaintiff Girard further believes her Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the modus operandi of cybercriminals that commit cyber-attacks of this type

274.    Plaintiff Girard has additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, particularly from bank lending companies (or

someone purporting to be one). Upon information and belief, these spam communications were caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

275.    The Data Breach has caused Plaintiff Girard to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

**Plaintiff Samuel Mathew**

276.    As a condition of receiving third-party administration services from Defendant, Plaintiff Mathew was required to supply Defendant with his Private Information, including but not limited to his full name, date of birth, Social Security number, and more.

277.    Plaintiff Mathew greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Mathew diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

278.    At the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Mathew's Private Information on its SharePoint server with inadequate data security, causing Plaintiff Mathew's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

279.    Plaintiff Mathew's Private Information compromised in the Data Breach has already been misused, as evidenced by notifications Plaintiff Mathew received since the Data Breach alerting that his Private Information had been found on the dark web.

280.    As a result of the Data Breach, Plaintiff Mathew has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to verifying the legitimacy of the Data Breach and approximately three hours spent changing passwords and monitoring his various accounts for fraudulent activity. Plaintiff Mathew has spent significant time on mitigation efforts in response to the Data Breach—valuable time he otherwise would have spent on other activities, including work and/or recreation. This time has been lost forever and cannot be recaptured.

281.    Plaintiff Mathew further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Mathew is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

282.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Mathew and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

283.    Plaintiff Mathew further believes his Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type

284.    Plaintiff Mathew has additionally suffered actual injury in the form of experiencing a significant increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual,

such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

285.    The Data Breach has caused Plaintiff Mathew to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

### Plaintiff Joshua Hunter Rhoades

286.    As a condition of receiving third-party administration services from Defendant, Plaintiff Rhoades was required to supply Defendant with his Private Information, including but not limited to his full name, date of birth, Social Security number, and more.

287.    Plaintiff Rhoades greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Rhoades diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

288.    At the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Rhoades's Private Information on its SharePoint with inadequate data security, causing his Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

289.    As a result of the Data Breach, Plaintiff Rhoades has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to verifying the legitimacy of the Data Breach and monitoring his various accounts for fraudulent activity on at least a weekly basis. Plaintiff Rhoades has spent significant time on mitigation activities in response to the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

290.    Plaintiff Rhoades further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Rhoades is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

291.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Rhoades's and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

292.    Plaintiff Rhoades further believes his Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the modus operandi of cybercriminals that commit cyber-attacks of this type

293.    Plaintiff Rhoades has additionally suffered actual injury in the form of experiencing a significant increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

294.    The Data Breach has caused Plaintiff Rhoades to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

**Plaintiff Richard Jesky**

295.    As a condition of receiving third-party administration services from Defendant, Plaintiff Jesky was required to supply Defendant with his Private Information, including but not limited to his full name, date of birth, Social Security number, and more.

296.    Plaintiff Jesky greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Jesky diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

297.    At the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Jesky's Private Information on its SharePoint server with inadequate data security, causing his Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

298.    As a result of the Data Breach, Plaintiff Jesky has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to verifying the legitimacy of the Data Breach and monitoring his various accounts for fraudulent activity on at least a weekly basis. Plaintiff Jesky has spent significant time on mitigation activities in response to the Data Breach—valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

299.    Plaintiff Jesky further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Jesky is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

300.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Jesky's and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

301.    Plaintiff Jesky further believes his Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the modus operandi of cybercriminals that commit cyber-attacks of this type

302.    Plaintiff Jesky has additionally suffered actual injury in the form of experiencing a significant increase in spam calls, texts, and/or emails following the Data Breach, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

303.    The Data Breach has caused Plaintiff Jesky to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed him of key details about the Data Breach's occurrence.

### Plaintiff Jennifer Keane

304.    As a condition of receiving third-party administration services from Defendant, Plaintiff Keane was required to supply Defendant with her Private Information, including but not limited to her full name, date of birth, Social Security number, and more.

305.    Plaintiff Keane greatly values her privacy and is very careful about sharing her sensitive Private Information. Plaintiff Keane diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

306.    At the time of the Data Breach—in or around March 2024—Defendant retained Plaintiff Keane Private Information on its SharePoint server with inadequate data security, causing

Plaintiff Keane Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

307.    Plaintiff Keane's Private Information compromised in the Data Breach has already been misused to commit identity theft and fraud against her. Specifically, following the Data Breach Plaintiff Keane experienced identity theft in the form of soft pulls on her credit that she did not authorize. Additionally, following the Data Breach, Plaintiff Keane has received notifications that her Private Information had been found on the dark web.

308.    As a result of the Data Breach, Plaintiff Keane has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to hours researching and verifying the legitimacy and underlying facts of the Data Breach, changing her passwords, and monitoring her account statements and credit reports. Plaintiff Keane has spent significant time on mitigation activities in response to the Data Breach—valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

309.    Plaintiff Keane further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Keane is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

310.    The risk of identity theft is impending and has materialized, as there is evidence that Plaintiff Keane and Class Members' Private Information was targeted, accessed, and misused, including through dissemination on the dark web.

311.    Plaintiff Keane further believes her Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the modus operandi of cybercriminals that commit cyber-attacks of this type

312.    Plaintiff Keane has additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach, given that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as his or her phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information.

313.    The Data Breach has caused Plaintiff Keane to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

## VI.    CLASS ACTION ALLEGATIONS

314.    Plaintiffs bring this nationwide class action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

315.    The class Plaintiffs seek to represent is defined as follows ("Class"):

All individuals in the United States whose Private Information may have been compromised in the Data Breach, including all individuals who received a Notice Letter.

316.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

317. Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

318. <u>Numerosity</u>. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiffs and exclusively in the possession of Defendant, upon information and belief, the number of individuals impacted is approximately 4,300,000. The Class is identifiable within Defendant's records, and Defendant's business partner has already identified these individuals (as evidenced by sending them Notice Letters).

319. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a.    Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b.    Whether Defendant had a duty not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c.    Whether Defendant had a duty not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d.    Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e.    Whether and when Defendant actually learned of the Data Breach;

f.  Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g.  Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Plaintiffs and Class Members are entitled to actual damages, compensatory damages, punitive damages, and/or nominal damages as a result of Defendant's wrongful conduct; and

k.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

320.  _Typicality._ Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

321.  _Adequacy._ Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

322. <u>Superiority and Manageability</u>. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

323. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

324. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class

Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

325.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

326.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

327.    <u>Policies Generally Applicable to the Class.</u> This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

328.    Likewise, particular issues under Rule 23(c)(2) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

      a.    Whether Defendant failed to timely notify the Plaintiffs and the class of the Data Breach;

b.   Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.   Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d.   Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.   Whether Defendant failed to take commercially reasonable steps to safeguard consumers' Private Information; and,

f.   Whether adherence to FTC and/or HIPAA data security rules and measures recommended by experts would have reasonably prevented the Data Breach.

## VII.   CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/NEGLIGENCE PER SE
**(On Behalf of Plaintiffs and the Class)**

329.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 328 above as if fully set forth herein.

330.   Defendant required Plaintiffs and Class Members to submit, directly or indirectly, personal, confidential Private Information to Defendant as a condition of third-party administration services.

331.   Plaintiffs and Class Members provided their Private Information to Defendant, and when the Data Breach took place, Defendant maintained the Private Information on its SharePoint.

332.   Defendant had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Defendant had duties

to Plaintiffs and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information.

333.    Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices by Defendant.

334.    Plaintiffs and Class Members had no ability to protect their Private Information in Defendant's possession.

335.    By collecting and storing Plaintiffs' and Class Members' Private Information, Defendant had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft.

336.    Defendant's duty of care obligated it to implement processes by which it could detect if its SharePoint was breached or if Private Information was exposed to unauthorized actors.

337.    Defendant's duty of care further obligated it to ensure its processes were sufficient to detect unauthorized access to its SharePoint or compromises of Private Information stored therein.

338.    Defendant owed a duty to Plaintiffs and Class Members to provide data security consistent with industry standards and legal and regulatory requirements, to ensure that its systems and servers and the people and entities with access to them adequately protected Plaintiffs' and Class Members' Private Information.

339.    Defendant was able to ensure its data security procedures were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiffs and Class Members were not.

340.    Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce,"

including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

341.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

342.    Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., Defendant had the further duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' PHI from unauthorized disclosure.

343.    Pursuant to HIPAA, Defendant had a duty to implement reasonable data security measures for the PHI in its care, including by, e.g., rendering the electronic PHI maintained in a form unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304.

344.    Additionally, pursuant to HIPAA, Defendant had a duty to provide notice of the Data Breach within 60 days of discovering it. *See* 42 C.F.R. § 2.16(b); 45 C.F.R. § 164.404(b). Defendant breached its duties to Plaintiffs and Class Members under the FTC Act and  HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices and procedures to safeguard Plaintiffs' and Class Members' Private Information, by failing to ensure the Private Information on its communal SharePoint server was encrypted and timely deleted when no longer needed, and by failing to provide notice to Plaintiffs and Class Members of the Data Breach until over 60 days after Defendant discovered it.

345.    Defendant's violations of the FTC Act and HIPAA as described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiffs and Class Members.

346.    Plaintiffs and Class Members are within the class of persons the FTC Act and HIPAA were intended to protect.

347.    The type of harm that resulted from the Data Breach was the type of harm the FTC Act and HIPAA were intended to guard against.

348.    Defendant's failures to comply with the FTC Act and HIPAA is negligence per se.

349.    Defendant's duties to use reasonable care in protecting Plaintiffs' and Class Members' Private Information arose not only as a result of the statutes and regulations described above, but because Defendant is bound by industry standards to secure such Private Information.

350.    Defendant breached its duties and was negligent by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure in the Data Breach. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

   a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

   b.    Failing to train employees to detect and protect against unauthorized access to or use of their user accounts;

   c.    Failing to require adequate cybersecurity procedures for initial access to its SharePoint;

   d.    Failing to adequately monitor the security of its SharePoint;

e.    Failure to periodically ensure it had plans in place to maintain reasonable data security safeguards, or to adequately test those plans;

f.    Causing unauthorized access to Plaintiffs' and Class Members' Private Information; and

g.    Failing to timely notify Plaintiffs and Class Members about the Data Breach so they could take appropriate steps to mitigate the potential for identity theft and other damages.

351.    But for Defendant's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiffs' and Class Members' Private Information would not have been compromised, and Plaintiffs' and Class Members' injuries would have been avoided.

352.    It was foreseeable that Defendant's failures to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would injure Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable to Defendant given the known high frequency of cyber-attacks and data breaches in Defendant's industry.

353.    It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would cause them one or more types of injuries.

354.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of their bargain; and (f) the continued and certainly increased risk to their Private Information, which

remains *(i)* unencrypted and available for unauthorized third parties to access and abuse; and *(ii)* in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

355.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

356.    Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT II**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

357.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 328 above as if fully set forth herein.

358.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they provided their Private Information to Defendant. In exchange, Plaintiffs and Class Members should have had their Private Information protected with adequate data security.

359.    Defendant knew Plaintiffs and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting, retaining, using, and profiting off managing the Private Information entrusted to it. Defendant profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' Private Information for business purposes and to generate revenue, including specifically for storing and managing the data.

360.    Defendant failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

361.    Defendant acquired the Private Information through inequitable record retention as they failed to investigate and/or disclose the inadequate data security practices previously alleged.

362.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information while profiting from Defendant's use and storage of that same data. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own pocket.

363.    Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of customers' Private Information.

364.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

365.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injuries and damages as set forth herein.

366.    Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant for its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

## COUNT III
## INVASION OF PRIVACY
### (On Behalf of Plaintiffs and the Class)

367.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 328 above as if fully set forth herein.

368.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

369.    Defendant owed a duty to all individuals from whom it collected and maintained Private Information, including Plaintiffs and Class Members, to keep their Private Information confidential.

370.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' Private Information is highly offensive to a reasonable person.

371.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and Class Members (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

372.    The Data Breach constitutes an intentional interference with Plaintiffs' and Class Members's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

373.    The Data Breach furthermore represents a public disclosure of private facts in that Defendant disclosed highly sensitive and private information, including Social Security numbers

and medical histories, to a large population of cybercriminals that operate on the dark web, where they go to purchase such information to use it for extortion or identity theft/fraud.

374.    Defendant acted with a knowing state of mind when it caused the Data Breach because it knew its information security practices were inadequate and, at a minimum, were substantially certain that its failure to implement reasonable, industry standard safeguards exposed Plaintiffs and  Class Members to privacy and economic harms. Indeed, this knowledge of substantial certain is increased because of the ubiquitous nature of cyberattacks against companies that have control over Private Information like Defendant.

375.    As a proximate result of Defendant's knowing acts and omissions, the private and sensitive Private Information of Plaintiffs and Class Members were stolen by a third party and likely redisclosed to further cybercriminals through the dark web and other black market channels—as that is the *modus operandi* of these types of cybergangs.

376.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members since their Private Information are still maintained by Defendant with their inadequate cybersecurity system and policies.

377.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the Private Information of Plaintiffs and Class Members.

378.    Defendant is liable for the privacy invasion against Plaintiffs and Class Members, in an amount to be determined by a jury.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated Class Members, request judgment against Defendant and that the Court grants the following:

A.      For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B.      For injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful acts described herein;

ii.   requiring Defendant to protect, in accordance with all applicable regulations, industry standards, and laws, including through encryption, all data collected;

iii.  requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Private Information;

v.    prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vi.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's server is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.    requiring Defendant to conduct regular database scanning and securing checks;

xi.    requiring Defendant to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendant to implement a system of tests to assess their customers' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.    for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

C.    For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined at trial;

D.    For an award of attorneys' fees and costs as allowed by law;

E.    For prejudgment interest on all amounts awarded; and

F.    Such other and further relief as this Court may deem just and proper.

## IX.    JURY TRIAL DEMANDED

Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury on all claims so triable.

Dated: April 29, 2025

By: */s/ Kenneth J. Grunfeld*
Kenneth J. Grunfeld (ID 84121)
Jeff Ostrow*
**KOPELOWITZ OSTROW, P.A.**
65 Overhill Road
Bala Cynwyd, PA 19004
Tel.: (954) 525-4100
grunfeld@kolawyers.com
ostrow@kolawyers.com

Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel.: (872) 263-1100
Email: raina@straussborrelli.com

Samantha E. Holbrook
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Tel.: (610) 477-8380
sholbrook@shublawyers.com

J. Gerard Stranch, IV*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel.: (866) 252-0878
gklinger@milberg.com

Courtney E. Maccarone
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel.: (212) 363-7500
cmaccarone@zlk.com

Thomas E. Loeser*
**COTCHETT, PITRE & MCCARTHY, LLP**
999 N. Northlake Way, Suite 215
Seattle, WA 98103
Tel.: (206) 802-1272
tloeser@cpmlegal.com.com

Andrew W. Ferich
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite
650 Radnor, PA 19087
Tel.: (310) 474-9111
aferich@ahdootwolfson.com

Lynn A. Toops*
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
Tel.: (317) 636-6481
ltoops@cohenandmalad.com

Jean S. Martin*
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel.: (813) 559-4908
jeanmartin@ForThePeople.com

Tyler J. Bean*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel.: (212) 532-1091
tbean@sirillp.com

*Counsel for Plaintiffs and Proposed Class*

\*Pro Hac Vice Forthcoming